HEALTH − LIFE-SUSTAINING PROCEDURES − EDUCATION − PUBLIC SCHOOLS − SCHOOL OFFICIALS MAY NOT PERFORM EMERGENCY PROCEDURES ON TERMINALLY ILL CHILD THAT ARE CONTRARY TO PARENTS' DECISION AND PHYSICIAN'S ORDER

May 13, 1994

*The Honorable J. Anita Stup*
*House of Delegates*

You have requested our opinion whether a public school must accept and follow a "do not resuscitate" ("DNR") order from the parents of a terminally ill child in school.

For the reasons stated below, we conclude that, if the attending physician of the child has entered a DNR order on the authorization of the child's parents, school officials must act in accordance with the order. We are *not* saying that school officials should stand by and do nothing if the child suffers a cardiac arrest at school. On the contrary, they are to do something crucially important − give comfort and reassurance to the child. But they are not to perform procedures that the child's parents and physician have ruled out.

## I

### Background

"Cardiac arrest is the sudden unexpected cessation of heartbeat and blood pressure. It leads to loss of consciousness within seconds, irreversible brain damage in as little as 3 minutes, and death within 4 to 15 minutes." Office of Technology Assessment, *Life-Sustaining Technologies and the Elderly* 168 (1985) (hereafter cited as *Life-Sustaining Technologies*).[1]

---

[1] Respiratory arrest is a related but at times distinct medical emergency: "Respiratory arrest is the sudden cessation of effective breathing .... Without effective breathing, the blood is unable to supply adequate oxygen to the heart and brain or eliminate carbon dioxide from

(continued...)

Cardiopulmonary resuscitation ("CPR") is the label for a set of procedures intended to restore heart and lung functions to someone who has suffered a cardiac arrest. One medical dictionary defines CPR as "restoration of cardiac output and pulmonary ventilation following cardiac arrest and apnea, using artificial respiration and closed chest massage." *Stedman's Medical Dictionary* 1349 (25th ed. 1990). "In describing the spectrum of procedures involved in resuscitation, it is helpful to divide the process into two stages: basic and advanced life support." *Life-Sustaining Technologies* at 169. Basic life support consists of techniques used by rescuers at the scene to open the airway and restore breathing and circulation; advanced cardiac life support "consists of basic life support and the techniques and machinery that sustain life after the immediate, manual steps are taken." *Id*. at 170. Some of the procedures involved in CPR, including chest compression, can be intrusive and painful.

The general presumption is that CPR is to be initiated on anyone who suffers a cardiac arrest, unless a specific order not to attempt resuscitation, a DNR order, had been entered for the patient. This inversion of the usual principle that consent is required prior to the initiation of a form of treatment has been justified by the emergency nature of the problem and the assumption that most people would want efforts made to save their lives.

A number of recent studies have suggested, however, that CPR may not make good sense for all patients. A procedure that was originally developed for otherwise healthy trauma victims can have exceedingly low success rates among patients with very serious health problems. *See generally* 79 *Opinions of the Attorney General* 218, 224 (1994).

Traditionally, DNR orders have been viewed as an issue for hospitals and nursing homes. The new Health Care Decisions Act, however, recognizes that DNR orders have a place in other settings too. Under §5-608(a) of the Health-General ("HG") Article, Maryland Code, "[c]ertified emergency medical services personnel shall be directed by protocol to follow emergency medical services

---

[1] (...continued)
body tissues. Consequently, respiratory arrest will be followed within minutes by gradual loss of consciousness and then by cardiac arrest." *Id*.

'do not resuscitate' orders pertaining to adult patients in the outpatient setting ...."[2]

This protocol, limited to adult patients, is not the only basis on which emergency medical services personnel may adhere to a DNR order. Emergency medical personnel already operate under a protocol for hospice patients. The Health Care Decisions Act also authorizes emergency personnel to adhere to a DNR order on the oral instruction of a physician, either "an on-line, emergency medical services medical command and control physician" or "a physician ... who is physically present on the scene with the patient ...." HG §5-608(c)(2) and (3). No outpatient DNR order precludes "medical interventions, or therapies deemed necessary to provide comfort care or to alleviate pain." HG §5-608(a).[3]

In the particular case that gave rise to your inquiry, the parents of a young child have sent a DNR order with their child to a public school in Frederick County. It is our understanding, from a conversation with the child's physician, that this child is terminally ill. Nevertheless, at this time, the child is well enough to attend school. The parents have sent the DNR order to school to ensure that no school official, teacher, principal, or school nurse attempts to administer CPR if their child should suffer a cardiac arrest at school.

In this opinion, we shall review the circumstances under which parents may consent to a DNR order for a school child. We shall then consider how a DNR order affects the response ordinarily expected of school officials in a medical emergency.[4]

---

[2] The protocol is to be established by the Maryland Institute for Emergency Medical Services Systems in conjunction with the State Board of Physician Quality Assurance. HG §5-608(a). The protocol has not yet been completed.

[3] An outpatient DNR order is not to be followed if the patient, "prior to cardiac or respiratory arrest, is able to, and does, express to [emergency medical] personnel the desire to be resuscitated." HG §5-608(b).

[4] This opinion does not discuss DNR orders that might result from the decision of an emancipated or mature minor. Our conclusions about

(continued...)

## II

## DNR Decisions By Parents

### A.    *Constitutional Authority*

The constitutional doctrine of parental autonomy is grounded in a series of Supreme Court decisions concerning parents' right to make educational decisions for their children.  The first case, *Myer v. Nebraska*, established that the liberty guaranteed by the Fourteenth Amendment encompassed "the right of the individual to ... acquire useful knowledge, to marry, establish a home and bring up children." 262 U.S. 390, 399 (1923).  Several years later, in *Pierce v. Society of Sisters*, the Court struck down an Oregon compulsory education act, concluding that the law "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control." 268 U.S. 510, 534-35 (1925).  Finally, in the landmark case of *Prince v. Massachusetts*, the Supreme Court announced that the "custody, care and nurture of the child resides

---

[4] (...continued)
the response of school officials would be the same, however, if the DNR order resulted from the child's own legally authorized decision.

The Health Care Decisions Act is applicable to a small class of minors, some few of whom might be in school.  The "competent individual" whose rights are set forth in the Act includes minors who are married or have given birth to a child.  HG §§5-601(b) and 20-102(a).  Under the common law, moreover, if a minor can demonstrate that he or she is mature enough to understand the consequences of a medical procedure, the minor can give the requisite informed consent.  *See* Restatement (Second) of Torts §892A cmt. a (1979) (if person consenting is a child, the consent may still be effective if the child is capable of appreciating nature, extent, and probable consequences of conduct consented to); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* §18 (5th ed. 1984) (capacity of minor to consent exists when the minor has the ability of average person to understand and weigh the risk and benefits of treatment).   While Maryland courts have not had the opportunity to consider this issue, other states have applied the doctrine. *See, e.g., In re E.G.*, 549 N.E.2d 322 (Ill. 1989); *Younts v. St. Francis Hospital & School of Nursing, Inc.*, 469 P.2d 330 (Kan. 1970); *Cardwell v. Bechtol*, 724 S.W.2d 739 (Tenn. 1987).  *Cf. Bonner v. Moran*, 126 F.2d 121 (D.C.Cir. 1941); *In the Matter of the Application of Long Island Jewish Medical Center*, 557 N.Y.S.2d 239 (N.Y. Sup. Ct. 1990).

first in the parents, whose primary function and freedom include preparation for obligations that the state can neither supply nor hinder."  321 U.S. 158, 166-67 (1944).

While the Supreme Court has not had the opportunity to consider the constitutional protection that should be accorded a parental decision to withhold medical treatment from a child, the Court did explore the issue of medical care decision-making in a case concerning a parent's decision to admit a minor to a mental hospital.  In *Parham v. J.R.*, 442 U.S. 584 (1979), the Court held that, even though a minor has a liberty interest in not being confined unnecessarily for medical treatment, parents retain a substantial, if not dominant, role in the decision, absent a finding of abuse or neglect.  The Court observed that "[m]ost children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment," and that "[p]arents can and must make those judgments." 442 U.S. at 603.

Since the Supreme Court has recognized that the relationship between parents and their children may be invaded only for the most compelling reasons, state courts, which generally decide matters concerning the family, give great deference to parental decisions involving minor children.   This deference has in part lead to a presumption that parents act in the best interests of their children and that the state may intervene in that relationship only when the health and safety of a child are in jeopardy.  In *Parham*, the Supreme Court discussed the presumption that parents generally act in ways that are beneficial to their children:

> [O]ur constitutional system long ago rejected any notion that a child is "the mere creature of the State" and, on the contrary, asserted that parents generally "have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations.  Surely this includes a "high duty" to recognize symptoms of illness and to seek and follow medical advice.  The law's concept of family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions.  More important,

historically it has recognized that natural
bonds of affection lead parents to act in the
best interests of their children.

442 U.S at 602 (citations omitted).

This presumption may also be based on the recognition that a
state is simply not an adequate surrogate for the judgment of a
loving, nurturing parent. One commentator has noted that the "law
does not have the capacity to supervise the delicately complex
interpersonal bonds between parent and child .... The state is too
crude an instrument to become an adequate substitute for the
parents." Joseph Goldstein, *Medical Care for the Child at Risk: On
State Supervision of Parental Autonomy*, 86 Yale L.J. 645, 650
(1977) (hereafter cited as *Medical Care for the Child at Risk*). The
Maryland General Assembly has also recognized that the State is not
an adequate substitute for a family by directing the Department of
Human Resources to "assist in preventing the necessity of placing
the child outside the child's home" and "to reunite the child with the
child's parent or guardian after the child has been placed in foster
care." §5-524 of the Family Law ("FL") Article, Maryland Code.
*See also Matter of McNeil*, 21 Md. App. 484, 497, 320 A.2d 57
(1974) (General Assembly has recognized that the primary right to
rear and nurture a child rests in the child's parents and not in the
State).

Even though the Supreme Court has held that parents are to be
afforded great discretion in making medical care decisions for
children, the State is not without power to interdict parental
decisions that jeopardize the health and well-being of their children.
The Court has observed that "the power of the parent ... may be
subject to limitation under *Prince* if it appears that parental decisions
will jeopardize the health or safety of the child." *Wisconsin v.
Yoder*, 406 U.S. 205, 233-234 (1972).

The State's authority to intrude upon the parent-child
relationship stems from its role as *parens patriae*. *Parens patriae*
refers to the State's sovereign power of guardianship over minors
and disabled persons and the duty of the State to protect children
within its jurisdiction. *Wentzel v. Montgomery County Gen. Hosp.*,
293 Md. 685, 702, 447 A.2d 1244 (1982), *cert. denied*, 495 U.S.
1147 (1983); *Black's Law Dictionary* 1114 (6th ed. 1990). As
*parens patriae*, the State has a wide range of power to limit the

rights of parents through appropriate legislation or judicial action.[5] With respect to medical care, §3-822 of the Courts and Judicial Proceedings Article gives a court the authority to order "emergency medical, dental or surgical treatment of a child ... if the child's parent, guardian or custodian is not available or, without good cause, refuses to consent to the treatment."

While the case law does not permit ready identification of a general rule that courts have used to justify a state's intervention as *parens patriae* into the medical decision-making of a parent, several broad guidelines have emerged. In cases where the parents refuse for religious reasons to authorize certain types of medical treatment in life-threatening situations, the courts routinely step in to authorize the treatment of the minor. For example, courts do not allow a child to be exposed to the risk of bleeding to death because of the parents' refusal on religious grounds to authorize a blood transfusion. *See, e.g., Jehovah's Witnesses v. King County Hosp.*, 278 F. Supp. 488 (W.D. Wash. 1967), *aff'd per curiam*, 390 U.S. 598 (1968) (one-sentence affirmance citing *Prince v. Massachusetts*); *In re Storar*, 420 N.E.2d 64, 73 (N.Y. 1981) (dictum). *See also Levitsky v. Levitsky*, 231 Md. 388, 190 A.2d 621 (1963) (parent's refusal to consent to blood transfusions for religious reasons may be bar to custody by parent); *Craig v. Craig*, 220 Md. 590, 155 A.2d 684 (1959) (parents cannot use religious beliefs as a defense in prosecution for breaching duty to furnish medical care to children).

Often a parent's refusal is not based on religious objection but on a parent's view of what is appropriate life-sustaining treatment, a view substantially different from that of the attending physician. *See generally* Annotation, *Power of the Court or Other Public Agency to Order Medical Treatment Over Parental Objections Not Based on Religious Grounds*, 97 A.L.R.3d 421 (1980). In these cases, where parents have a different view of what is appropriate medical treatment, if there is a reasonable probability that the treatment refused by the parents could save the child's life, then the courts have again typically ordered treatment. *See, e.g., Custody of a Minor*, 379 N.E.2d 1053 (Mass. 1978). *But see, e.g., In re Hofbauer*, 393 N.E.2d 1009 (N.Y. 1979) (parental decision to opt for alternative form of cancer treatment was reasonable under the

---

[5] FL Title 5 delineates the obligations of the State in protecting children that have been abused and neglected, as well as those that have been placed in foster care.

circumstances).  If, on the other hand, the treatment that is refused does not offer a child a reasonable probability of recovery, then a court would likely defer to the parent's decision. *See, e.g., Newmark v. Williams*, 588 A.2d 1108 (Del. 1991).[6]

## B.    *Common Law Authority*

The doctrine of informed consent has evolved from the common law rule that a physician, while treating a mentally competent adult under non-emergency circumstances, may not perform surgery or any other type of medical procedure without the prior consent of the patient.  Accordingly, a physician who performed any type of procedure without the consent of a patient would commit a battery, an unauthorized touching.  Restatement (Second) of Torts §892B cmt. i (1979). The common law rule has evolved from one merely requiring that a patient's bare consent be obtained for a procedure to one requiring doctors to inform patients of the risks and benefits of the proposed treatment before obtaining consent.

In *Sard v. Hardy*, the leading case in Maryland on the doctrine of informed consent, the Court of Appeals stated:

> [T]he doctrine of informed consent imposes on a physician before he subjects his patient to medical treatment, the duty to explain the procedure to the patient and to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment.

---

[6] If the treatment is not life-saving but for cosmetic or developmental reasons, courts have generally been unwilling to override a parent's refusal of treatment. *See, e.g., In re Phillip B.*, 156 Cal. Rptr. 48 (Cal. App. 1979), *cert. denied*, 445 U.S. 949 (1980); *In re Green*, 292 A.2d 387 (Pa. 1972). *See generally* Annotation, *Power of Court or Other Public Agency to Order Medical Care Over Parental Religious Objections for Child Whose Life is Not Immediately Endangered*, 52 A.L.R.3d 1118 (1973).  However, some courts have ordered non-life-sustaining treatment over the objections of the parents out of concern for the child's physical and emotional well-being. *See, e.g., In re Sampson*, 278 N.E. 2d 918 (N.Y. 1972); *In re Rotkowitz,* 175 Misc. 948 (N.Y. Dom. Rel. Ct. 1941).

281 Md. 432, 439, 379 A.2d 1014 (1977). Thus, failure to perform the duty of informing patients of the risks and benefits of therapy could subject the physician to a cause of action. 281 Md. at 440. While some courts have held that surgery performed without a patient's informed consent is a technical battery, *e.g., Shetter v. Rochelle*, 409 P.2d 74, 82 (Ariz. Ct. App. 1965), *modified on other grounds*, 411 P.2d 45 (Ariz. Ct. App. 1966), the Court of Appeals has adopted the view that a cause of action under the informed consent doctrine is properly cast as a tort action for negligence. 281 Md. at 440 n.4.

Because minors are generally thought to be incapable of adequately assessing all of the pertinent factors involved in making important medical decisions, minors are generally considered legally incompetent for purposes of medical decision-making. *Medical Care for the Child at Risk,* 86 Yale L.J. at 650; Alan Meisel, *The Right to Die* §13.2 (1989) (hereafter cited as *The Right to Die).*[7] Consequently, there is a common law principle that parents, as natural guardians, possess the authority to make medical decisions for their children without being appointed by a court.

This common law principle has been codified in FL §5-203, which delineates the responsibilities of a parent in relation to the child. This section provides that "parents are the joint natural guardians of their minor child" and "the parents of a minor child are jointly and severally responsible for the child's support, care, nurture, welfare and education." While this section does not expressly include medical care within the responsibilities of a parent, the Court of Appeals has held that medical care is indeed embraced within the scope of the broad language used in FL §5-203. *State v. Fabritz*, 276 Md. 416, 348 A.2d 274 (1975), *cert. denied*, 425 U.S. 942 (1976). *See also Craig v. State*, 220 Md. 590, 155 A.2d 684 (1959); *Robey v. State*, 54 Md. App. 60, 456 A.2d 953, *cert. denied*, 296 Md. 224 (1983).[8]

---

[7] *But see* note 4 above (exception for emancipated and mature minors).

[8] Failure to provide necessary medical care for children can, under some circumstances, subject a parent to criminal penalties. *Robey,* 54 Md. App. at 77-79. As a civil matter, child "neglect" includes "failure to give proper care and attention to a child by any parent ... under circumstances that indicate ... that the child's health or welfare is harmed or placed at risk

(continued...)

Parents, therefore, must make decisions for their children about treatment alternatives as part of their responsibility to provide for their children's medical care.[9]  Consequently, parents must be provided with the same information regarding the risks and benefits of proposed treatment as would be provided to the minor if the minor were competent to make the treatment decision.  Further, physicians must obtain the consent of the parents before performing any medical treatment on a child. *The Right to Die*, §13.4, at 416-417 (1989). *See also In re Guardianship of Barry*, 445 So.2d 365 (Fla. App. 1984) (parents were properly informed of child's condition and lack of treatment alternatives by physicians).

## C.    *Refusal of Life-Sustaining Procedures*

Few reported cases deal with the authority of a parent to refuse life-sustaining medical treatment for a child when that refusal is within the range of medically reasonable choice. We suspect that the lack of decisions is not due to the fact that parents are not making these decisions, but rather because decisions of this character have traditionally been made within the privacy of the family relationship based on competent medical advice and consultation by the family with their religious advisers. In most of these situations, the decision never presents a controversy requiring judicial review. *See Care and Protection of Beth*, 587 N.E.2d 1377, 1380 (Mass. 1992) (courts should not be in the business of reviewing DNR orders that are not controversial); *In re Barry*, 445 So. 2d 365, 372 (Fla. App. 1984) (parental decision to refuse treatment for terminally ill child supported by competent medical advice is sufficient without court approval).

In *In re L.H.R*, 321 S.E.2d 716 (Ga. 1984), the Georgia Supreme Court decided that the parents of a terminally ill infant

---

[8] (...continued)
of significant harm ...." FL §5-701(p) (as amended by House Bill 630 of the 1994 Session, effective October 1, 1994).  Anyone who has reason to believe that a child has been subjected to neglect has a duty to notify the local department of social services.  FL §§5-704 and 5-705.

[9] Certain exceptions to this general rule are provided by statute. *See* HG §§20-102 (drug abuse, alcoholism, venereal diseases, and pregnancy) and 20-103 (abortion).

existing within a "chronic vegetative state" had the authority to have life-support systems removed. The court began its analysis with the presumption "that the parent has the child's best interests at heart." 321 S.E. at 722. The court noted that the constitutional right of an adult patient to refuse medical treatment is not lost because of the youth of the patient and reasoned that the only remaining question "is who may exercise this right on behalf of a terminally ill infant who is in a chronic vegetative state with no reasonable possibility of attaining cognitive function." *Id*. In holding that the parents, as natural guardians of the infant, have the right to refuse treatment for the infant, the court stated:

> We conclude that the decision whether to end the dying process is a personal decision for family members or those who bear a legal responsibility for the patient. We do not consider this conclusion an abdication of responsibility by the judiciary. While the courts are always available to protect the rights of the individual, the condition of this [infant] is such that the decision is one to be made by the family and the medical community.

321 S.E.2d at 723. As for the state's compelling interest as *parens patriae* in maintaining the child's life, the court reasoned that the state does not have an interest in prolongation of dying, since a decision to maintain life-support would simply extend the child's dying process. 321 S.E.2d at 723.

In *Newmark v. Williams*, 588 A.2d 1108 (Del. 1991), the Delaware Division of Child Protective Services petitioned the court for temporary custody of a child in order to authorize the hospital to treat a child's cancer condition after the parents refused to give consent for treatment on religious grounds. The treatment that the Division of Child Protective Services wanted to authorize was "extremely risky, toxic and dangerously life-threatening ... offering less than a 40% chance for 'success'." 588 A.2d at 1110. In upholding the parents' medical decision and rejecting the petition for custody, the Delaware Supreme Court distinguished the other cases where courts ordered treatment over the religious objections of the parents, because in those cases there was a high chance of successful treatment and minimally intrusive treatment. 588 A.2d at 1119-20.

The Delaware court reasoned that parents have "the right at some point to reject medical treatment for their child." 588 A.2d at 1120. The court also recognized the intimate nature of this type of decision: "Parents undertake an awesome responsibility in raising and caring for their children. No doubt a parent's decision to withhold medical care is both deeply personal and soul wrenching. It need not be made worse by the invasions which both the State and the medical profession sought [in this case]." 588 A.2d at 1120-21.

In *In re Barry*, 445 So. 2d 365 (Fla. Dist. Ct. App. 1984), the District Court of Appeal in Florida considered a petition by the parents of a terminally ill child to have the child's life support systems removed. The court noted that the doctrine of substituted judgment, which calls on the court to base its judgment on what it determines the patient, if competent, would have done, is inapplicable in the case of minors, because it is the parents and their medical advisors who must make these decisions. 445 So. 2d at 371. Furthermore, even if judicial intervention is necessary, the court must be guided primarily by the judgment of the parents, as long as their judgment is supported by competent medical evidence. *Id*. In upholding the parents' petition to withdraw life support, the court reasoned that it was "the right and obligation of the parents in such instance to exercise their responsibility and prerogative ... of making an informed determination as to whether these extraordinary measures should be continued." *Id.*

Several other courts have ruled on whether a DNR order is appropriate for a child who is terminally ill. *In re C.A.*, 603 N.E.2d 1171 (Ill. App. Ct. 1992), *cert. denied*, 610 N.E.2d 1264 (Ill. 1993); *Care and Protection of Beth*, 587 N.E.2d 1377 (Mass. 1992); *Custody of a Minor*, 434 N.E.2d 601 (Mass. 1982). In each of these cases, however, the minor was a ward of the state, so the guardian of the child had to receive court approval before the DNR order could be entered on the child's medical record. The Illinois Appellate Court commented that if the child's parents were competent adults and they consented to the DNR order, that "decision would have remained in the private domain and the court would not have become involved." 603 N.E.2d at 1180. Two of the courts engaged in a "substituted judgment" test, and the other court used a "best interests of the child" analysis to determine whether the DNR order was appropriate. In each case, the court upheld the entry of the DNR order for the terminally ill child.

Overall, these cases demonstrate that parents do have a right to refuse medical care for their children as long as that refusal is medically appropriate. It is also evident that when a parent is available and willing to make medical decisions for the child, there is no need for court approval of a decision to refuse medical treatment, if that decision is within the zone of reasonable medical choice.

The child's attending physician has the primary responsibility to define that zone of reasonableness. The child's physician owes to the child "that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which he belongs, acting in the same or similar circumstances." *Shilkret v. Annapolis Emergency Hosp.*, 276 Md. 187, 200, 349 A.2d 245 (1975). A physician may not agree to enter a DNR order if the duty of care to the child, considering all medically relevant circumstances, would require efforts to resuscitate in the event of a cardiac arrest. Conversely, in light of this duty, the very fact that the attending physician has entered a DNR order implicitly conveys the physician's judgment that the decision is medically appropriate.

## III

### The Role of the School

#### A.    *In Loco Parentis*

Maryland courts have held consistently that "the relation of a school vis a vis a pupil is analogous to one who stands in loco parentis, with the result that a school is under a special duty to exercise reasonable care to protect a pupil from harm." *Lunsford v. Board of Education.*, 280 Md. 665, 676, 374 A.2d 1162 (1977) (citing *Segerman v. Jones*, 256 Md. 109, 123-24, 259 A.2d 794 (1969)). *See also Collins v. Board of Educ.*, 48 Md. App. 213, 218, 426 A.2d 10 (1981) (school authorities have a common law duty, "as the temporary custodian of children, to exercise reasonable care for their protection").

*In loco parentis* means "[i]n the place of a parent; instead of a parent; charged, factitiously, with a parent's rights, duties, and responsibilities." *Black's Law Dictionary* 1296 (6th ed. 1990). *See Pope v. State*, 284 Md. 309, 322-23, 369 A.2d 1054 (1979). The common law doctrine of *in loco parentis*, as it has been applied to

schools, delegates to the teacher the status of the parent with some, but not all, of the parent's privileges; the doctrine extends to matters that enable teachers to perform their duties as a teacher and to activities connected with the school program. *State v. Baccino*, 282 A.2d 869 (Del. Super. Ct. 1971). *See also Pope,* 284 Md. at 324 ("a school teacher has responsibility for the supervision of a minor child in connection with his academic duties"). *See generally* 79 C.J.S. *Schools and School Districts* §493 (1952).

However, the doctrine of *in loco parentis* does not delegate to a teacher the authority to exercise judgment, as a parent may, in the treatment of injury or disease suffered by a student. *O'Brien v. Township High School District*, 415 N.E.2d 1015, 1018 (Ill. 1980); *Guerrieri v. Tyson*, 24 A.2d 468, 469 (Pa. 1942). *See also* W. Page Keeton, *et al.*, *Prosser and Keeton on the Law of Torts* §27 (5th ed. 1984) (the privilege given to teachers does not extend to the forcible treatment of injury or disease). It has been held that medical treatment is not sufficiently related to activities connected with the school program to allow teachers to attempt medical treatment on students. *O'Brien*, 415 N.E.2d at 1017. Consequently, medical treatment of a child is a question for the parents of the child to decide, not the teacher or the school. *O'Brien*, 415 N.E.2d at 1018; *Guerrieri*, 24 A.2d at 469.[10]

Because the doctrine of *in loco parentis* does not allow schools to provide non-emergency medical treatment to students, schools have developed procedures for dealing with students with special medical needs.[11] We have not surveyed every county's school board procedures for dealing with medical treatment for children, but it is our understanding that all local school system procedures prohibit schools from administering any non-emergency medication or

---

[10] Of course, the fact that parents have decided that their child is to receive medical treatment of a particular type does not create a duty on the part of the schools to be the providers of such treatment. The extent to which schools might *provide* treatment at parents' request is a matter of policy not addressed in this opinion, which deals solely with parents' right to insist that schools *refrain from providing* unwanted treatment.

[11] The school procedures also have been developed out of concern for the school's tort liability for providing medication or medical treatment that might harm the student.

medical treatment without the consent of the parent or guardian.[12] This requirement of parental consent also includes obtaining consent for over-the-counter medication, such as aspirin.

### B.    *Emergency Care*

As for the right and the duty of the school to act in emergency situations, the doctrine of *in loco parentis* as well as the doctrine of informed consent allows the school to provide emergency medical treatment without the consent of the parent. The doctrine of *in loco parentis* allows a school to provide emergency treatment because under normal circumstances, when a healthy child is critically ill, a parent has a duty to provide for that treatment. *Guerrieri*, 24 A.2d at 469. In many cases, failure to summons and provide appropriate emergency medical care have subjected a school to legal liability. *See Czaplick v. Gooding Joint School District*, 775 P.2d 640, 646 (Idaho 1989) (principal may be liable for not calling ambulance and

---

[12] Frederick County Public School Regulation 400-23 provides as follows:

> The Frederick County Public School staff are prohibited from recommending or prescribing any form of medication to a pupil.
>
> 1. No medication will be administered in school without a completed "Physician's Medication Authorization for Prescription and Nonprescription Medication" form and the medication in a properly labeled prescription container from a licensed pharmacist. Parental consent and a physician's statement and medication prescription label are required for:
>
> a. Each episode of illness or condition and for each medication ordered during the school year and any change in the time or dosage of medication.

*See also* Montgomery County Public Schools Regulation No. 525-13 ("[s]chools are prohibited from providing or administering any medication including aspirin to ... [a] pupil except as authorized by the parent (guardian)").

for failing to render adequate first aid to school child); *Barth v. Board of Education, City of Chicago*, 490 N.E.2d 77, 84 (Ill. 1986) (school officials liable for failing to take student to the hospital after parent instructed school to do so); *Mogabgab v. Orleans Parish School Board*, 239 So.2d 456, 461 (La. App. 1970) (high school coaches who failed to summon medical assistance held liable). *But see Peck v. Board of Education of City of Mount Vernon*, 317 N.Y.S.2d 919, 921 (N.Y. App. Div. 1970), *aff'd*, 283 N.E. 2d 618 (N.Y. 1972) (school officials not liable for delay in obtaining medical treatment for student when treatment would have been futile).

Emergencies are recognized as exceptions not merely to the parental consent requirement for children, but also to the informed consent requirement for adults. Restatement (Second) of Torts §892D (1979). HG §5-607 provides that a "health care provider may treat a patient who is incapable of making an informed decision, without consent, if the treatment is of an emergency nature." This section also allows a health care provider to treat a patient if the person who is authorized to give consent is not available immediately. HG §5-607(a)(2). In order to treat a patient without consent, the attending physician must first determine that there is a substantial risk of death or immediate harm to the patient and the life or health of the patient would be affected adversely by delaying treatment to obtain consent. HG §5-607(a)(3).[13]

The authority of a school to summon and provide appropriate emergency medical care has led schools to develop procedures for dealing with medical emergencies. It is our understanding that a school will generally call 911 before attempting to administer any type of treatment to a child who is critically ill. Schools will also attempt to call the parents to inform them of the child's medical

---

[13] It is important to clarify, however, that the emergency exception may not be used to circumvent an adult patient's prior refusal of treatment if the patient had decision-making capacity at the time of the refusal. *The Right to Die* §2.21, at 36 (prior refusal by competent decision-maker is binding on the physician). *See also* Restatement (Second) of Torts §892D cmt. a (emergency action without consent is not privileged if the actor has reason to believe that the other, if he had the opportunity to consent, would decline to consent). *Cf.* 79 *Opinions of the Attorney General* at 230-31 (DNR decision-making in health care facilities).

condition.[14]   *See Barth*, 490 N.E.2d at 79 (parent called after ambulance was summoned).  After emergency services personnel have been called, school personnel may attempt to administer some type of treatment, depending on the illness of the child.

In the case of a child who suffers a cardiac arrest, properly trained school personnel may be called upon to perform CPR on the child before or after the emergency services personnel have been called.[15]   In most cases, this school procedure is an appropriate response.

However, if a parent refuses to consent to a particular set of emergency treatment procedures, namely CPR, and that refusal of consent is reflected in a physician's DNR order, then the school must honor the DNR order and not perform CPR should the child suffer a cardiac arrest at school.  School officials have no legal basis for substituting their medical judgment for that of the parents and the physician.[16]  When school personnel perform CPR on a child with a DNR order, they are improperly substituting their judgment − that CPR should be administered − for that of the parents and physicians − that CPR should not be administered.

---

[14] State Board of Education regulations require schools to keep an updated emergency information card, which would include phone numbers for parents or guardians.  COMAR 13A.05.05.09(B)(2).

[15] State Board of Education regulations require that the school health services professional, the school health services aide and at least one adult in each school be certified in CPR.  Furthermore, one certified person is to be available in the school during the regular school day and at all school-sponsored athletic events.  COMAR 13A.05.05.09.  The Frederick County Public Schools do not have school health services personnel or school nurses located in the schools on a regular basis.  Consequently, in Frederick County another adult in the school is trained in CPR.

[16] The doctrine of *in loco parentis* as applied to the medical treatment of children in schools, is analogous to the doctrine of informed consent, which prevents physicians from substituting their judgment as to what is appropriate medical care for that of their patients or, in this case, of the parents.  *Sard v. Hardy*, 281 Md. at 440 (quoting *Collins v. Itoh*, 503 P.2d 36, 40 (Mont. 1972)).

As stated earlier, the doctrine of *in loco parentis* does allow a school to provide emergency treatment to a student, because it assumes that the parent would act in the same manner in those circumstances. The consent of the parents for the treatment is implicit. However, in the case of a student with a DNR order, the school knows that the parents would not provide emergency medical treatment, CPR, to the child in the event of cardiac arrest, because they have authorized an order forbidding it. Consequently, consent for the CPR can never be assumed when there is a valid DNR order. *See* Restatement (Second) of Torts §892D cmt. a (1979) (if the actor knows or has reason to know, because of past refusal of consent or other circumstances, that consent would not be given, he is not privileged to act).

If a school simply refuses to accept the DNR order and school employee performs CPR on the child against the wishes of the parents, then the employee is at risk of liability for battery and potentially other torts. *See O'Brien*, 415 N.E.2d. at 1017 (school officials not immune from liability for alleged negligent medical treatment of student); *Guerrieri*, 24 A.2d at 468 (teachers liable in trespass for damages for medical treatment of school child). *See generally Duncan v. Koustenis*, 260 Md. 98, 271 A.2d 547 (1970) (teachers and other school employees are not immune from tort actions).[17]

## C.   *Practical Concerns*

The duty of schools to accept a DNR order will lead to many practical concerns, most of which relate to the application of State Board of Education regulations that were adopted to respond to

---

[17] We are aware that sometimes "a school nurse" is actually an employee of the local health department assigned to a school, rather than an employee of the school system itself. While some of the details of the analysis might vary (for example, the doctrine of *in loco parentis* would not apply, because parents only delegate their duties and privileges to employees of the school), the conclusion is the same with respect to this category of school nurse.

students with special health needs.[18]   We briefly address some of those concerns.

School systems have expressed the fear that they risk liability for failing to administer some other type of medical treatment if a teacher incorrectly believes that the student is experiencing cardiac arrest.  An example of this misapprehension would be if a student with a DNR order is choking, but the teacher believes incorrectly that the student is suffering a cardiac arrest and does not attempt to remove the obstruction.  The school's concern is that teachers are asked to make medical judgments that they are not qualified to make – in this example, deciding whether a student is choking or going into cardiac arrest.

Even if a properly trained teacher were unable to tell whether the child was choking or going into cardiac arrest, a DNR order would ordinarily not be violated if the teacher simply attempted to remove a possible obstruction. "A cardiopulmonary arrest requiring [advanced cardiac life support] should be distinguished from a respiratory arrest resulting from upper airway obstruction (*e.g.*, aspiration of food) ....  One assumes that patients who are choking would be treated, *i.e.*, receive certain components of basic CPR." Donald J. Murphy, *Do-Not-Resuscitate Orders: Time for Reappraisal in Long-Term-Care Institutions*, 260 J.A.M.A. 2098 (1988).

This example illustrates a broader point:  a school is entitled to obtain clarification from the student's parents and physician about the exact scope of the DNR order.  The school can ask about the specific procedures that are prohibited and permitted, such as removing a blockage or perhaps doing mouth-to-mouth resuscitation. In our view, physicians and parents have a duty to delineate carefully in the DNR order or an explanation of it which medical treatments are authorized to be given in the school system:

> [E]veryone needs to know what [the] DNR
> order does not mean.  If [the student] hurts
> herself or encounters difficulties that may call

---

[18] The phrase "special health needs" is defined in the regulations as "temporary or long-term health problems arising from physical, emotional or social factors or any combination of these." COMAR 13A.05.05.06(B)(2).  In our view, a terminally ill student with a DNR order would be a "student with special health needs."

> for emergency measures other than resuscitation, people need to respond appropriately. The best way they can sort out these difficulties is to discuss matters beforehand ....

Giles R. Scofield, *A Student's Right to Forgo CPR*, 2 Kennedy Inst. of Ethics J. 4, 8 (1992). This commentator recognizes that school staff understandably feel uncomfortable about doing nothing and that school staff "need to learn how to do something other than CPR and feel comfortable doing that." *Id*. He notes that providing comfort care would meet the needs of the student, which are to be neither resuscitated nor abandoned, and would enable those who wish to care for the student to do something toward that end. *Id*.[19]

State Board of Education regulations require "[t]he principal, in consultation with the designated school health services professional, to identify school personnel who are to receive in-service training in providing the recommended services for students with special health needs." COMAR 13A.05.05.08(E). Schools, therefore, have an affirmative duty to provide training for certain personnel to deal with a student with a DNR order. Part of this in-service training could include discussing which interventions the DNR order encompasses and which it does not and directing the provision of comfort care measures to the student until emergency services personnel arrive. In addition, the regulations require a nursing care plan for emergency and routine care to be prepared by the designated school health services professional. COMAR 13A.05.05.08(B). The plan that would be prepared for a student with a DNR order could carefully instruct teachers on the appropriate steps to be taken if the child suffers a cardiac arrest.

Another concern is the possibility that other school personnel who were unaware of the DNR order and performed CPR on the student would subject the school to liability for attempting CPR. The State Board of Education regulations anticipate this problem, for they require "[t]he designated school health services professional

---

[19] A thoughtfully prepared document called "Students on Hospice Protocol Implementation Procedures," now under consideration by the Howard County Board of Education, assigns to a health services coordinator responsibility to "review the physician order and perform a nursing assessment to determine the factors necessary to implement the request." Procedures ¶II. *See also* ¶IV (planning meetings required).

[to] make appropriate school personnel aware of the students in the school who have special health needs that may require intervention during the school day." COMAR 13A.05.05.08(C). The regulation, therefore, imposes a duty to inform all teachers and other school personnel who may at some point supervise the child of the existence of the DNR order and the procedures for dealing with the child in the event of cardiac arrest. We assume, moreover, that only personnel certified in CPR would attempt to perform resuscitative procedures on any student. As a practical matter, all of these people can be alerted if a child at the school has a DNR order.

Finally, the greatest concern that school officials have expressed over accepting DNR orders is the possible effect that the student's death may have on the other students in the classroom, assuming the child suffers a cardiac arrest at school. School officials are worried that if they do not provide CPR to a student, other students in the classroom will think that teachers and school officials will not provide them with emergency treatment should they become critically ill.[20] Officials are also concerned about the emotional effect that the student's death would have on the other students.

Honoring the parents' decision and the physician's order does not mean doing nothing, however. The teacher *would* be doing something to help the student with the DNR order who suffers a cardiac arrest. The teacher would be summoning emergency personnel and would comfort the child until emergency services personnel arrive. Other students who observed this conduct are unlikely to view it as the school's refusing to help a critically ill student.

When we say that a school must accept a DNR order, moreover, we are not suggesting that the school must refrain from calling 911 for emergency services. The mere act of calling 911 is not a medical treatment issue within the purview of a DNR order.[21]

---

[20] In fact, because not every teacher is certified in CPR, a child *without* a DNR order who suffers a cardiac arrest might not receive CPR until trained personnel arrive.

[21] The degree of intervention by the emergency medical services personnel is a medical treatment issue, of course, but it is a separate one, calling for discussion among the child's parents and physician and the local provider of emergency services. *See* Part I above.

 *See* Part I above. Thus, schools that accept DNR orders would not be required to refrain from calling 911. Rather, a school's response to the child's cardiac arrest would be to follow normal emergency procedures, except the provision of CPR, and to call the emergency services personnel, who would then be guided by their own policies and procedures.

Perhaps the simplest answer to the question about what other students may think about a school's duty to help them when they observe a student with a DNR order suffer a cardiac arrest is for the teacher to remove the other students from the classroom. Removing the other children from the classroom could be part of the nursing care emergency plan developed by the school in accordance with State regulations. COMAR 13A.05.05.08(B).[22]

As for the emotional trauma that students will experience from the death of a student with the DNR order, that the terminally ill student is "going to die soon [with or without CPR] is an objective fact that inevitably will disturb ... classmates." Stuart J. Youngner, *A Student's Rights Are Not So Simple*, 2 Kennedy Inst. of Ethics J. 13, 16 (1992). About all that schools can really be expected to do is to help the students come to terms with the experience: "The death of a fellow student, with or without intervention, could be used as an

---

[22] Some school systems are also concerned with potential legal liability to other students who may claim that they have suffered emotional harm from a child's dying at school. A cause of action for the tort of intentional infliction of emotional distress exists only if the conduct is intentional or reckless, extreme and outrageous, and there must be a causal connection between the defendants' wrongful conduct and the emotional distress. The emotional distress must also be severe. *See, e.g.*, *Harris v. Jones*, 281 Md. 560, 380 A.2d 611 (1977). *See generally* Richard J. Gilbert and Paul T. Gilbert, *Maryland Tort Law Handbook* §§16.1 to 16.1.4 (2d ed. 1992). Conceivably, students would claim that because the school accepted the DNR order, the school intentionally caused them harm by forcing them to watch a student die. Given that parents have a right to refuse medical treatment for their child through a DNR order and schools have a legal duty to accept it, the hypothetical tort action of the other students would be that the exercise of a lawful right of one person provides the basis for a cause of action by another. It is highly unlikely that a court would entertain such an action.

opportunity for education, exploration of fears, mutual support, and if necessary counseling." *Id.*[23]

## VI

## Conclusion

In summary, it is our opinion that, if the attending physician of a terminally ill child has entered a DNR order on the authorization of the child's parents, school officials must accept the order and refrain from medical interventions that are not consistent with it.

J. Joseph Curran, Jr.
*Attorney General*

Jack Schwartz*
*Chief Counsel*
  *Opinions and Advice*

*Amanda Stakem Conn, a volunteer intern in the Opinions and Advice Division, contributed substantially to the preparation of this opinion.

---

[23] The Howard County proposal discussed in note 19 above contains provisions that address the need for counseling and support. Implementation Procedures ¶¶VII and VIII.